**UNITED STATES, Plaintiff–Appellee,**

v.

**Daniel Lee GARRETT, Defendant–Appellant.**

**No. 03–5939.**

United States Court of Appeals,
Sixth Circuit.

Aug. 11, 2004.

Before KRUPANSKY and GILMAN, Circuit Judges; and MAYS, District Judge.*

## OPINION

MAYS, District Judge.

Daniel Lee Garrett pled guilty to violating 18 U.S.C. §§ 922(g)(1) and 924. His plea followed a suppression hearing at which the district court suppressed evidence found in a search of Garrett's apartment but declined to suppress evidence found in Garrett's car. Garrett's guilty plea was conditional, Garrett having reserved the right to seek review of the decision not to suppress evidence found in his car. Garrett now appeals, claiming that the police officer who stopped him lacked reasonable suspicion to make the stop. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

On September 17, 2001, two officers from the Gallatin, Tennessee Police Department accompanied the mother and grandfather of a thirteen-year-old girl to Garrett's apartment. The grandfather

---

* The Honorable Samuel H. Mays, Jr., United States District Judge for the Western District of Tennessee, sitting by designation.

was a Sumner County Sheriff's Deputy and had called for backup before going to the apartment to retrieve his granddaughter. Garrett invited the girl's family members and the police officers inside, and a conversation ensued. The conversation concluded with the police officers telling Garrett that he was a victim of circumstance. The girl then left with her family, sometime in the afternoon, and was taken to a hospital. Around 7:00 p.m., the girl alleged that she and Garrett had sex while at his apartment. If true, Garrett had committed statutory rape.

Officer Hesson began investigating the alleged rape the night of September 17th. Hesson suspected that there might be evidence connected to the rape in Garrett's apartment. Based on the testimony of the defendant and the actions of the police officers, the court concluded that the girl had also informed Officer Hesson that the defendant had drugs and/or guns in his car. Hesson continued his investigation into the early morning hours of September 18, 2001, but he did not seek a warrant that night. The next morning, Hesson requested that another officer observe Garrett's apartment and monitor his activities until Hesson could arrive to conduct the surveillance himself. The district court concluded that Hesson's decision could be explained only by his desire to follow Garrett once Garrett had entered his car and then conduct a traffic stop so that the officer could search for drugs and guns in Garrett's car.

Officer Ballard began his surveillance of Garrett's apartment at 8:00 a.m. on September 18th. At approximately 9:30 a.m., Garrett left his apartment building carrying at least one trash bag. Garrett went around the corner of the apartment build-

ing to a dumpster and, when Ballard saw him next, Garrett's hands were empty. Garrett went to a white Cadillac, which Ballard knew to be Garrett's, and left the apartment building. Ballard informed Hesson of Garrett's activities and Hesson instructed Ballard to follow Garrett. Hesson testified that he believed Garrett might have disposed of evidence. Hesson became concerned that Garrett was attempting to flee when Ballard relayed that Garrett was on Hollow Pike Road, a route out of Gallatin. At that point, Garrett had traveled less than a mile. Hesson discussed the issue with his supervisor, who suggested a traffic stop of Garrett, although Garrett had apparently broken no traffic regulations.

Before Ballard could conduct a traffic stop, however, Garrett reached his destination on a dead-end street. Garrett was following his regular morning routine of visiting his one-year-old daughter and her mother, Tonya Law, before going to work. When Garrett pulled into Law's driveway, Ballard pulled in behind him at an angle, preventing Garrett from leaving. Ballard was in an unmarked car, but turned on flashing blue-and-white lights for the dual purposes of indicating to Garrett that Ballard was a police officer and to warn other motorists that his car was still partially in the road. Garrett did not notice Ballard until both men had left their cars. Ballard showed Garrett his badge and indicated that Hesson wanted to speak with Garrett. Ballard indicated that Hesson would arrive shortly and asked Garrett to wait, which Garrett agreed to do. Hesson arrived approximately a minute later.

Garrett testified that Hesson told him the police stopped him because they had reason to believe that Garrett had guns or drugs in his car. Hesson then requested permission to search Garrett's Cadillac and Garrett consented. During that search, Hesson found a box of ammunition in the glove compartment. Hesson knew at that point that Garrett was a convicted felon and that it was illegal for him to possess ammunition. When asked about the ammunition, Garrett stated that he had only recently purchased the Cadillac, had discovered the ammunition in the trunk while cleaning it, and had subsequently moved the ammunition to the glove box.

Having found only ammunition in the Cadillac, Hesson asked Garrett if Garrett owned another car. Garrett responded that he owned a Oldsmobile Cutlass and, upon request, granted Hesson permission to search that car. Hesson then told Garrett that they needed to go back to Garrett's apartment. Garrett was not given the option of driving his own car back, but was placed in the back of a marked police cruiser. Nothing incriminating was found during the search of the Oldsmobile. The police also searched the dumpster Garrett had gone to earlier in the day. They found a bag that contained, in addition to normal waste items, a necklace that spelled out the name of the alleged rape victim and letters from the alleged victim to Garrett. After finding these items, Hesson asked the officer who had driven Garrett back to his apartment to get out of the cruiser.

Hesson told Garrett that he needed to search Garrett's apartment and needed Garrett's consent to do so. When Garrett did not respond, Hesson repeated the request. Garrett, who had been arrested numerous times before and was familiar with the criminal justice system, asked whether he was under arrest or free to leave. Hesson responded that Garrett was not under arrest but that he was not free to leave because he was "under investigation." Hesson testified that, given his years of experience, he could tell that Gar-

rett was uncomfortable with the potential search of the apartment. At that point, Hesson indicated that he was not interested in anything he might find in the apartment except evidence related to the alleged statutory rape. Although Garrett did not immediately respond, he eventually indicated that he had a gun under his mattress and some marijuana on his dresser. Hesson then had Garrett sign a consent to search the apartment. Hesson spent fifteen minutes alone with Garrett to obtain his consent. During that time, Garrett was locked in the back of a police cruiser and had been told he was not free to leave.

Upon entering the apartment, Hesson located the marijuana and the gun. He bagged those items and later testified that they were of interest in the rape investigation because he was interested in having charges placed against Garrett. Later that day, Garrett was charged as a felon in possession.

Garrett moved to suppress the evidence found in his apartment and his Cadillac, and the district court held hearings on December 12, 2002 and January 9, 2003. The district court first determined that Garrett had been seized when he was placed in the back of the police cruiser to be transported back to his apartment, finding that Garrett could not leave the cruiser unless someone opened the door from the outside. Thus, Garrett's consent to search the apartment was invalid because too much time had passed to consider the detention a *Terry* stop. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The gun and the marijuana were suppressed.

The court determined that the initial stop was a *Terry* stop and, therefore, that the police needed reasonable suspicion under the totality of the circumstances to make the stop. The district court held

that there was a reasonable suspicion that Garrett had disposed of evidence given that Garrett had placed trash bags in a dumpster the morning after a thirteen-year-old girl's family had accused him of rape. The district court did not determine whether the police had an articulable suspicion that Garrett was fleeing prosecution. Although the district court found as a matter of fact that the alleged rape victim had told Hesson that Garrett had drugs or guns in his car, the court did not hold that this also provided reasonable suspicion to conduct the search.

## ، II.   ANALYSIS

### A.   Standard of Review

This court reviews the district court's factual findings in a suppression hearing for clear error and reviews the district court's conclusions of law *de novo. United States v. Leake,* 95 F.3d 409, 416 (6th Cir.1996). Further, this court reviews *de novo* the district court's determination about whether certain facts establish a seizure or detention in violation of the Fourth Amendment. *United States v. Buchanon,* 72 F.3d 1217, 1223 (6th Cir.1995). "[A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

### B.   The Initial Encounter

■ This court has held that there are three types of permissible encounters between the police and citizens "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable articulable suspicion of criminal activity; and (3) the arrest valid only if supported by probable cause." *United*

*States v. Avery*, 137 F.3d 343, 352 (6th Cir.1997) (citations omitted). The government argues that the encounter among Ballard, Hesson and Garrett was a consensual encounter or an investigative detention for which the police had a reasonable articulable suspicion. Garrett argues that the encounter was an investigatory detention for which the police lacked a reasonable articulable suspicion or an arrest for which the police lacked probable cause.

Not every interaction between a civilian and the police constitutes a seizure for Fourth Amendment purposes. *United States v. Taylor*, 956 F.2d 572, 575 (6th Cir.1992). "[L]aw enforcement officers may approach individuals and ask general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that he was not free to leave." *United States v. Waldon*, 206 F.3d 597, 603 (6th Cir.2000). A request to conduct a search does not transform initial questioning into a seizure. *United States v. Baro*, 15 F.3d 563, 566 (6th Cir.1994). "A 'seizure' occurs during a police-citizen encounter 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Taylor*, 956 F.2d at 575–76 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). A reasonable person may not feel free to leave if the officer engages in overbearing or coercive activity in making requests or conveys the message that compliance with requests is required. *See Waldon*, 206 F.3d at 603. The threatening presence of several officers, the display of a weapon by an officer, or some physical touching might also indicate to a reasonable person that he or she is not free to leave. *Mendenhall*, 446 U.S. at 554. Whether an encounter is consensual depends on the officer's objective be-havior, not on any subjective suspicion of criminal activity. *Waldon*, 206 F.3d at 603. Police officers may initiate consensual encounters even when they suspect the civilian of wrongdoing but cannot yet articulate a reasonable suspicion as to why. *Id.*

Garrett argues that his encounter with Ballard constituted a traffic stop because Ballard would have stopped him even if he had not stopped of his own accord when he had reached his destination. This argument impermissibly considers the subjective intent of the officer. *See Taylor*, 956 F.2d at 576 n. 2 (stating that officer's testimony that he would not have allowed the suspect to "flee" is irrelevant where that intention was not communicated to the suspect at the time). The district court found, as a matter of fact, that Garrett did not notice Ballard's flashing lights until after Garrett had reached his destination, parked his car, and voluntarily left the car. The fact that Ballard would have stopped Garrett, had Garrett not stopped on his own, does not make the encounter between Ballard and Garrett a traffic stop. *See United States v. Perez–Sosa*, 164 F.3d 1082, 1084 (8th Cir.1998) (holding that where driver did not see a trooper's flashing lights or ignored them, then pulled into a gas station and began fueling, the subsequent encounter between the officer and the motorist was a consensual encounter). Further, the testimony about what Ballard had been directed to do and would have done is irrelevant because Ballard did not communicate this information to Garrett at the time of the encounter. The initial encounter between Ballard and Garrett was the consensual stop of a pedestrian, as the district court ruled.

The initial encounter between Ballard and Garrett was also consensual. Police officers may identify themselves as

such without being coercive or intimidating. Here, Ballard turned on his blue lights and showed Garrett his badge. He asked Garrett if he would be willing to wait for Officer Hesson to arrive and discuss the rape investigation with him. Hesson arrived within a minute. The district court, however, found that, based on the combination of the flashing blue lights, visible (though holstered) guns and three or four officers at the scene, the consensual encounter had escalated into a *Terry* stop by the time Garrett gave his consent to search the Cadillac. The combination of factors the district court considered in deciding that Garrett would not have felt free to leave find their origin in Supreme Court decisions. *See, e.g., Mendenhall,* 446 U.S. at 554. The district court did not err in holding that the encounter between Garrett and the police was no longer consensual when Garrett provided consent to search the Cadillac.

## C. Reasonable and Articulable Suspicion

■ To conduct a *Terry* stop, a police officer must have a reasonable and articulable suspicion that a person has been involved in criminal activity. *See United States v. Heath,* 259 F.3d 522, 528 (6th Cir.2001). "Based upon [the totality of the circumstances and] the whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Under such circumstances, the suspect may be briefly detained to investigate the suspicious circumstances. *Id.* Garrett contends that, because the police lacked a reasonable articulable suspicion to conduct a *Terry* stop, his consent to search the Cadillac during that stop was invalid.

Three options were presented to the district court about why the police officers might have had a reasonable articulable suspicion of criminal activity: (1) that Garrett was fleeing prosecution, (2) that Garrett had attempted to destroy evidence, and (3) that Garrett had drugs and/or guns in his car. The district court decided that the police had a reasonable articulable suspicion that Garrett had destroyed evidence. The district court declined to hold that the police had a reasonable articulable suspicion that Garrett was fleeing prosecution. The court did not rule on whether the alleged victim's statement about Garrett's having guns and/or drugs in his car provided a reasonable articulable suspicion of criminal activity. This court can affirm the district court on any grounds supported by the record. *S.W. Williamson County Cmty. Ass'n, Inc. v. Slater,* 173 F.3d 1033, 1036 (6th Cir.1999).

The record supports the conclusion that the police had a reasonable articulable suspicion that Garrett, a convicted felon, had drugs and/or guns in his car. The district court found, as a matter of fact, that the girl who had accused Garrett of statutory rape had also told police that Garrett had drugs and a gun in his car. The girl was a neighbor of Garrett's, had spent time in Garrett's apartment, and had written him a number of letters (indicating significant contact with him). The finding that the alleged rape victim had provided such information was based on the actions of Officer Hesson. Officer Hesson did not obtain a search warrant for Garrett's apartment, but rather had his apartment watched and attempted to conduct a traffic stop once Garrett was in his car. The district court also found, based on Garrett's testimony, that Hesson told Garrett that Hesson had reason to believe Garrett had drugs and/or guns in his car. After the police searched Garrett's Cadillac and found ammunition, but no drugs or guns, they asked Garrett if he owned another car. The police then asked for permission to search that car. Only after the police failed to find drugs or a gun in Garrett's second car did they ask

for consent to search his apartment. Based on this information, the district judge's conclusion that the alleged rape victim had advised police that Garrett had drugs and a gun in his car was not clear error. Further, these facts give rise to a reasonable articulable suspicion that Garrett was engaged in criminal activity, and the police could detain him for a short time to investigate their suspicions. While Garrett was detained, he gave his consent for the police to search his Cadillac. The district court's decision not to suppress the ammunition found in the Cadillac was therefore correct as a matter of law.

### III. CONCLUSION

After carefully reviewing the record, the briefs, and the applicable law, the court finds itself in agreement with the outcome reached by the district court. The judgment of the district court is therefore **AFFIRMED**.