Randy DYE, Plaintiff

v.

CITY OF WARREN, et al., Defendants.

No. 4:03CV2593.

United States District Court,
N.D. Ohio,
Eastern Division.

April 22, 2005.

Kenneth D. Myers, Esq., Cleveland, OH, for Plaintiff.

James E. Sanders, Esq., City of Warren, Department of Law, Warren, OH, Jill S. Patterson, John S. Kluznik, Sr., Hilary S. Taylor, Esq., Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WELLS, District Judge.

This matter arose when various members of the City of Warren police force initiated two traffic stops against Randy Dye. As a result of those stops, Mr. Dye brought a three-count claim, pursuant to 42 U.S.C. § 1983, against the police officers and the City of Warren

City of Warren Chief of Police John Mandopoulos (variously referred to as "Chief Mandopoulos" or "Chief") and the City of Warren ("City") have placed before this Court their separate motions for summary judgment of plaintiff Randy Dye's ("Dye") complaint against the Chief and certain John Doe police officers for excessive force and against the City for failure to properly train the officers. (Docket Nos. 18, 19, 20). Chief Mandopoulos urges summary judgment on the basis of qualified immunity, statute of limitations, and collateral estoppel. (Docket No. 20). The City urges summary judgment predicated on the argument that no policy or custom

of the City precipitated a constitutional violation. (Docket No. 19). In addition, both defendants address the need to dismiss unidentified defendant officers "John Does 1–5" pursuant to the one-year limitations for assault and battery under Ohio Revised Code § 2305.11. Mr. Dye has provided a response and the defendants have submitted a joint reply. (Docket Nos. 22. 23).

The plaintiff leveled constitutional and statutory law claims against defendants John Mandopoulos, City of Warren and unnamed Warren police officers John Doe 1–5. (Docket No. 1). Specifically, Mr. Dye mounts three charges: Chief Mandopoulos' actions during an initial traffic stop constituted a violation of his Fourth Amendment right to be free from excessive force (Count I); Chief Mandopoulos and Officers John Doe 1–5 violated his Fourth Amendment right to be free from excessive force during the second traffic stop (Count II); and, the City of Warren failed to properly train its police officers in violation of the City's obligation to maintain lawful policies and procedures pursuant to *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (Count III). *Id.*

## I. BACKGROUND

The events precipitating this matter occurred on January 11, 2002[1] just shy of Mr. Dye's nineteenth birthday. Mr. Dye recounts in his complaint that he was driving through Warren, Ohio around noon, after visiting with his grandmother at a local hospital. (Affidavit of Randy Dye, Exhibit A to Plaintiff's Responses to Defendants' Motions for Summary Judgment,

¶ 3). Traveling westbound on East Market Street in his mother's Buick Regal, Mr. Dye saw a single flash of white light in his rear-view mirror while he was stopped at a light. (Aff.¶ 4). Thinking the light was the reflection of another driver's mirror, the plaintiff proceeded along East Market through several intersections. (Aff.¶ 5). About this time Mr. Dye saw a flashing light and pulled to the shoulder of East Market Street "thinking a police car or emergency vehicle was passing on the way to an emergency." (Aff.¶ 7). Mr. Dye contends that he did not know, at the time, that Chief Mandopoulos was trying to pull him over to the side of the road. *Id.*

Chief Mandopoulos pulled up behind Mr. Dye's Buick in an unmarked SUV and approached plaintiff's vehicle. According to Mr. Dye's account, Chief Mandopoulos, who wore civilian clothes, quickly flashed his badge, identified himself as a detective with the City of Warren Police Department and asked for Mr. Dye's identification. (Aff.¶¶ 8, 9). Plaintiff responded by asking what he had done wrong. Mr. Dye recounts the Chief replied: "I'm the chief of fucking police, I don't care who you are and if you don't show me some ID, I'll drag you out of the car." (Complaint ¶ 15; Aff. ¶ 10). The Chief then reached into the driver's side window "grabbed plaintiff's shirt collar and then grabbed plaintiff by the throat while attempting to open plaintiff's car door." (Complaint ¶ 16; Aff. ¶ 13).

Fearing for his safety, Mr. Dye drove away until, "a couple of blocks" later, he came to his doctor's office where he stopped his car and "attempted to run to

1. The motion for summary judgment, the response and reply as well as the affidavits of Mr. Dye, Chief Mandopoulos and witness Wilson each refer to the incident as occurring on 12 January 2002. However, the printed police records and Mr. Dye's hospital records reference 11 January 2002. The Court will operate on the reasonable belief that the incident in question arose as reported by the law enforcement and hospital records on 11 January 2002.

his doctor's office screaming for someone" to help him. (Affidavit ¶ 15). According to the complaint, as Mr. Dye stepped out of his car, Chief Mandopoulos grabbed him and forcibly dragged him to a police cruiser which had arrived at the scene where the Chief struck the plaintiff and "pounded plaintiff's head against the hood or roof of the police cruiser while other officer[s][sic] sprayed plaintiff's eyes with mace." (Complaint ¶ 19; Aff. ¶ 16). Other officers then shoved Mr. Dye so that he struck his Buick with his back and placed handcuffs on him "while continuing to rough him up." (Complaint ¶ 20; Aff. ¶ 17). Mr. Dye was then forcibly shoved into a police cruiser and taken to the Warren Police Station where the Chief and other officers "taunted plaintiff." (Complaint ¶ 21; Aff. ¶ 18). After being released from custody, Mr. Dye sought medical attention at a hospital where he was "treated for a concussion, and sprains of the wrist and neck." (Complaint ¶ 23; Aff. ¶ 20). Mr. Dye subsequently sought psychological and psychiatric treatment as a result of the incident. (Complaint ¶ 24).

Chief Mandopoulos' version of events differs markedly from Mr. Dye's. According to the affidavit of Chief Mandopoulos, he began pursuing Mr. Dye's vehicle when he observed the plaintiff drive through a red light on East Market Street narrowly missing two vehicles that were turning off of Eastland and on to Market. (Affidavit of John Mandopoulos, Exhibit B to Motion for Summary Judgment on Behalf of Defendant Chief Mandopoulos, ¶ 3). According to Chief Mandopoulos, he pulled Mr. Dye over at East Market, just west of Laird Street and approached the vehicle, whereupon Mr. Dye "screamed 'fuck you, you didn't read me my Miranda rights," ' and drove off. (Aff.¶ 4).

Chief Mandopoulos returned to his SUV and pursued Mr. Dye's vehicle using his lights and siren as plaintiff "drove very recklessly, zigzagging between cars." (Aff.¶ 6). The Chief caught up with Mr. Dye's vehicle at East Market and Chestnut but the plaintiff refused to stop until Market Street and Park, where the Chief boxed Mr. Dye's vehicle in and approached the car. (Aff.¶¶ 5, 6, 7).

According to the Chief, Mr. Dye first refused to exit the vehicle, then left the vehicle and "began screaming for someone to call his mother, his doctor, the Tribune, the Vindicator, and Attorney Ivancheck." (Aff.¶ 7). The Chief grabbed for Mr. Dye as the plaintiff got back into his car and tried to start the Buick. (Aff.¶ 8). In the process Mr. Dye managed to slam the car door into the Chief's right hand. (Aff.¶ 8). The Chief then pulled the keys from the ignition and removed Mr. Dye from the car. (Aff.¶ 9). According to the Chief's account, at that point several patrolmen who had arrived at the scene assisted the Chief in handcuffing Mr. Dye who continued to struggle violently but then stopped yelling as "his eyes rolled back in his head" whereupon Mr. Dye "became very violent and began screaming for someone to get Dr. Smedi." (Aff.¶ 9). Mr. Dye was placed into a patrol cruiser and taken to police headquarters where he was photographed, printed and released on bond. *Id.*

Included with Chief Mandopoulos' motion for summary judgment is the affidavit of William R. Wilson, a witness to the events at the second traffic stop of Mr. Dye. (Exhibit D to Defendant Mandopoulos' Motion for Summary Judgment). Mr. Wilson recounts that on the day of the incident he was visiting friends in the Atrium Building near the corner of Park Avenue and Market Street in Warren when the sounds of sirens and street commotion caused him to exit the building and witness Mr. Dye's arrest.[2] (Aff.¶¶ 3, 4). When

---

**2.** The distance between the initial traffic stop

at Laird Street, which is uncontested as to

Mr. Wilson reached the sidewalk he observed Mr. Dye's car pulled to the curb with the Chief's SUV behind and a police cruiser parked at an angle in front of the plaintiff's Buick. (Aff.¶ 5).

Mr. Wilson recounts that as the Chief approached Mr. Dye's vehicle, the plaintiff "was yelling that he wanted his rights and for someone to call his doctor, for someone to call his mother, and for someone to call the news media." (Aff.¶ 7). At the time Mr. Wilson thought plaintiff "had mental problems or was on drugs." (Aff.¶ 8). Mr. Wilson noted that Chief Mandopoulos was telling Mr. Dye that he needed to calm down and get out of the car. (Aff.¶¶ 9, 10, 11). Mr. Wilson observed the Chief attempt to open the car door and take the plaintiff's keys from the ignition as Mr. Dye slammed the car door on the Chief's hand. *Id.* Mr. Wilson also noted the Chief made a second, successful attempt to take the keys from Mr. Dye's car. (Aff.¶ 12, 13). Mr. Wilson further observed the Chief and another officer remove Mr. Dye from the Buick whereupon the plaintiff "calmed down a little bit but became very combative when the officers were walking Dye toward the front of the cruiser." (Aff.¶ 14).

Mr. Wilson recounted Chief Mandopoulos was no longer involved with the plaintiff as other officers bent Mr. Dye, face down, onto the hood of the police cruiser to secure handcuffs to his wrists. (Aff.¶¶ 15, 16). According to Mr. Wilson, the plaintiff continued "screaming that he wanted his rights, for someone to call his mother, and for someone to call the news media." (Aff.¶ 18). Mr. Wilson noted that Mr. Dye's yelling and fighting continued while officers worked to place him in the back seat of the police cruiser and even after the plaintiff was in the cruiser with the car

door closed Mr. Wilson heard the plaintiff "yelling about his rights and for someone to call his mother." (Aff.¶¶ 20, 21, 22). Mr. Wilson returned to the Atrium Building when the police began to leave the scene. (Aff.¶ 23).

Mr. Dye was charged with state law violations of reckless operation of a vehicle, resisting arrest and disorderly conduct. At the second pre-trial hearing held in the Warren Municipal Court on 16 April 2002, *City of Warren v. Randy W. Dye*, Case Nos. 02 CRB 112 & 02 TRD 455, Mr. Dye, represented through his attorney James Tekavec, withdrew his prior not guilty pleas and entered a plea of no contest with consent to a finding of guilty on the disorderly conduct charge. (Transcript of second pretrial hearing in the Warren Municipal Court, Exhibit C to defendant Mandopoulos' Motion for Summary Judgment). During the pretrial hearing Mr. Dye also stipulated to probable cause for the charges of resisting arrest and reckless operation of a vehicle. (Exhibit C).

When asked by the municipal court whether Mr. Dye or his counsel wished to make any remarks prior to sentencing for disorderly conduct, Mr. Tekavec responded:

> Your Honor, I can only say that I've known this young man for—for basically all of his life.... He has a medical problem, which requires that he maintain his medication. And at a point just prior to this incident, he stopped taking the medication, and that resulted in some erratic behavior that's—its under control, Your Honor.
>
> He's on his medication now. His mother's in the courtroom. And I think she would confirm that he is—has been

---

location, and Park Street, which is also uncontested as to location, amounts to more than 11 blocks, a distance of nearly one mile.

well behaved. He's not caused her any problems. And everything has been going along pretty much in a normal manner.

(Exhibit C). The Warren Municipal Court imposed a thirty day suspended sentence upon Mr. Dye conditioned upon his successful completion of two years of probation. The central aspect of the probation required Mr. Dye to meet regularly with Ms. McCoy, a court assigned "adult treatment specialist," to help Mr. Dye properly monitor the regular administration of his medication. (Exhibit C).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial") (*quoting Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994) (marking as standard that the plaintiff must present "more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine

factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted).

## III. LAW AND ANALYSIS

### A. Statute of Limitations in Excessive Force Claims.

 As an initial matter, this Court addresses the applicable limitations period as it pertains to the Chief, the City and John Does 1–5. As § 1983 contains no statute of limitations, federal courts apply the most analogous state statute of limitations, which is that for personal injury actions. *Wilson v. Garcia,* 471 U.S. 261, 268, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *Sharpe v. Cureton,* 319 F.3d 259, 266 (6th Cir.2003). The statute of limitations for § 1983 actions arising in Ohio is two years under O.R.C. § 2305.10. *Browning v. Pendleton,* 869 F.2d 989, 990 (6th Cir.1989) (*en banc* ). *Hodge v. City of Elyria,* 126 Fed. Appx. 222 (6th Cir.2005) (in a case involving excessive force the court noted that a § 1983 claim in Ohio is governed by a two-year statute of limitations, pursuant to Ohio Rev.Code § 2305.10).

Contrary to the defendants' assertions, the statute of limitations controlling Mr. Dye's complaint is not the one-year limit pertaining to O.R.C. § 2305.111 for disorderly conduct, but the two-year limit under O.R.C. § 2305.10 for bodily injury.[3] The

incident giving rise to Mr. Dye's complaint occurred on 11 January 2002 and Mr. Dye filed his complaints against Chief Mandopoulos, the City and John Does 1–5 on 23 December 2003. (Docket No. 1). Mr. Dye's complaint falls within the appropriate time limit with regard to the Chief and the City, but as discussed below, not with regard to John Does 1–5.

### B. Application of Fed.R.Civ.P. 15(c)(3) & Statute of Limitations to Unnamed John Doe Defendants.

The plaintiff's continued failure to amend his complaint to name the still unnamed officers causes the complaint to fall outside the applicable limitations period with regard to those specific defendants. Thus, unless the still unamended complaint relates back to the original, timely-filed complaint, at the time it is amended to add the new officers the plaintiff's action is time-barred as against the defendants John Does 1–5.

Mr. Dye has satisfied neither the notice nor relation back requirements of Fed. R.Civ. P. 15(c)(3). While not discussed in any of the parties' briefs, failure to meet either of those independent requirements establishes ground for this Court to dismiss the suit against those unnamed officers. The John Does 1–5 have received neither actual nor constructive notice as deemed necessary under Fed R. Civ. P. 15(c)(3)[4] and 4(m).[5]

---

**3.** Ohio Revised Code § 2305.10 directs: An action for bodily injury or injuring personal property shall be brought within two years after the cause thereof arose.

**4.** The relation back issue is controlled by Fed. R.Civ.P. 15(c), which in pertinent part provides:

(c) Relation Back of Amendments. An amendment of a pleading relates back to the date of the original pleading when

(1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or

(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the sum-

Independently, under Fed.R.Civ.P. 15(c)(3)(B), an amended complaint that adds a new defendant relates back to the original complaint only if the newly-named defendant "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against [him]." This requirement is not satisfied where the caption of an original complaint refers to "John Doe" officers and, after the expiration of the applicable limitations period, an amended complaint specifically names those officers. See *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir.), *cert. denied*, 519 U.S. 821, 117 S.Ct. 78, 136 L.Ed.2d 37 (1996). The *Cox* court clarified that "[s]ubstituting a named defendant for a 'John Doe' defendant is considered a change in parties, not a mere substitution of parties." 75 F.3d at 240.[6]

This interpretation of Rule 15(c) is consistent with the statement in *Schiavone v. Fortune*, 477 U.S. 21, 29, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986), which explains "[r]elation back [as] dependent upon four factors, all of which must be satisfied." The third of those factors is the requirement that the newly-named "party must or should have known that, but for a mistake concerning identity, the action would have been brought against it. . . ." *Id.* See also *Doe v. Sullivan County, Tennessee*, 956 F.2d 545, 552 (6th Cir.), *cert. denied*, 506 U.S. 864, 113 S.Ct. 187, 121 L.Ed.2d 131 (1992) (ad-

---

mons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Pursuant to this Circuit's decision in *Berndt v. Tennessee*, 796 F.2d 879 (6th Cir.1986) whether the parties received constructive notice depends on several factors such as the relationship between the unnamed parties and the named defendants and whether the old and new parties share representation. In the instant matter, Mr. Dye has yet to identify any of the other officers involved in the incident that occurred more than three years ago, he has served no discovery requests on the City, the John Does 1–5 have no representation. This Circuit has recognized that, in instances such as the matter here, where rank and file officers were not "high officials" of the city or of the police department and would not have been involved in the city's legal affairs they would not necessarily have notice of the institution of the action. See *Force v. City of Memphis*, 101 F.3d 702, 1996 WL 665609 (6thCir.1996). Moreover, the Court in *Berndt* found the fact that the plaintiff was incarcerated at the time of the incident and was proceeding *pro se* significant to its reading of constructive notice. Those factors do not bear on the instant matter.

**5.** Rule 4(m) provides:

(m) Time Limit for Service. If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period. This subdivision does not apply to service in a foreign country pursuant to subdivision (f) or (j)(1).

The John Does 1–5 remain unidentified and unserved by the plaintiff now more than three years from the date of the incident. Nor has Mr. Dye served discovery on the City for the identities of these unnamed officers.

**6.** While Cox represents the first Sixth Circuit application of this rule in a case where named parties have been substituted for parties originally described as "John Does" the Sixth Circuit has long held that "FRCP 15(c) allows the correction of misnomers, but not the addition or substitution of new parties after the statute of limitations has expired." *In re Kent Holland Die Casting & Plating, Inc.*, 928 F.2d 1448, 1450 (6th Cir.1991). *See also Ringrose v. Engelberg Huller Co., Inc.*, 692 F.2d 403, 405 (6th Cir.1982); *Marlowe v. Fisher Body*, 489 F.2d 1057, 1064 (6th Cir.1973).

dressing whether parties added by an amendment must or should have known that, but for a mistake concerning identity, the action would have been brought against them within the period of limitations). Any proposed amendment by Mr. Dye, at this late date, to change the John Does 1–5 to identified officers would amount to less than a mistake concerning identity and consequently, could not relate back to his original complaint.[7]

## C. Issue Preclusion and Mr. Dye's State Court Admissions.

Defendants have moved for summary judgment on the grounds that, in state court, Mr. Dye pled "no contest" to disorderly conduct and admitted the existence of probable cause for his arrest on Resisting Arrest and Reckless Operation of a Vehicle. The defendants summarily assert that Mr. Dye's admissions "not only serve to eliminate any Fourth Amendment claim due to the existence of probable cause, but create, in effect, collateral estoppel concerning the excessive force claims." (Def's.Br.16). The Supreme Court has held that issues decided in a state court criminal proceeding may have a collateral estoppel effect in a section 1983 civil rights action, but only to the extent that the plaintiff sought relitigation of the same issues which were previously decided in the criminal proceeding. *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). *See also Donovan v. Thames*, 105 F.3d 291, 295–97 (6th Cir.1997) (concluding that a conviction for resisting arrest does not bar a subsequent excessive force claim).

In order to determine whether there is preclusive effect, this Court must look to Ohio law to gauge the impact of Mr. Dye's criminal conviction in state court on his right to assert a section 1983 civil rights claim in federal court. To determine the effect of a state court proceeding, the federal court must look to the laws of the state in which the proceeding took place. *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). As long as the party against whom the doctrine is invoked had a full and fair opportunity to litigate the issue, a federal court can collaterally estop a party from re-litigating a constitutional matter in a 42 U.S.C. § 1983 action. *Allen v. McCurry*, 449 U.S. at 101, 103–04, 101 S.Ct. 411 (1980). The law in Ohio is well-settled on this issue:

> In order to assert collateral estoppel successfully, a party must plead and prove the following elements:
>
> (1) The party against whom estoppel is sought was a party or in privity with a party to the prior action;
>
> (2) There was a final judgment on the merits in the previous case after a full and fair opportunity to litigate the issue;
>
> (3) The issue must have been admitted or actually tried and decided and must be necessary to the final judgment; and
>
> (4) The issue must have been identical to the issue involved in the prior suit.

---

7. Other jurisdictions also limit relation back to instances of mistake or misnomer. *See, e.g., Wilson v. United States Government*, 23 F.3d 559, 563 (1st Cir.1994); *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir.1993) (noting that it is familiar law that "John Doe" pleadings cannot be used to circumvent statutes of limitations, because replacing a "John Doe" with a named party in effect constitutes

a change in the party sued), modified, 74 F.3d 1366 (1996); *Worthington v. Wilson*, 8 F.3d 1253, 1256 (7th Cir.1993) (concluding the mistake provision of Rule 15(c)(3)(B) requires a mistake or misnomer in the name of the original defendant, and a plaintiff's lack of knowledge of the names of the unknown officers does not amount to such a mistake or misnomer).

*Monahan v. Eagle Picher Indus., Inc.*, 21 Ohio App.3d 179, 486 N.E.2d 1165, 1168 (1984); *see also Goodson v. McDonough Power Equipment, Inc.*, 2 Ohio St.3d 193, 443 N.E.2d 978, 981 (1983). *Wallace v. Mamula*, 30 F.3d 135, 1994 WL 389197 (6th Cir.1994); *Walker v. Schaeffer*, 854 F.2d 138, 143 (6th Cir.1988) (in federal civil action defendants estopped from asserting officers lacked probable cause for an arrest in which defendants pled *nolo contendere* to the arrest in state court guilty verdicts).

■ Mr. Dye's Section 1983 excessive force claim is not precluded by his plea of no contest for disorderly conduct and his admission of probable cause for resisting arrest and reckless operation of a vehicle. First, Mr. Dye is not claiming the defendants did not have probable cause for each of the two traffic stops. Second, disorderly conduct does not countenance excessive force such that Mr. Dye's no contest plea to disorderly conduct would preclude the separate issues examined in his Section 1983 excessive force claim. Consequently, in this case, the issue of whether Chief Mandopoulos used excessive force in arresting Mr. Dye was neither actually litigated nor necessary to a determination on the charge of disorderly conduct in state court. Because Mr. Dye entered a "no contest" plea, the state court, in accepting such a plea, did not hear any evidence on the conduct of Chief Mandopoulos nor did it need to hear evidence of the legality of the Chief's conduct.

### D. Reasonableness of Force, Constitutional Deprivation and Qualified Immunity with Regard to Chief Mandopoulos.

Mr. Dye claims his Fourth Amendment right to be free from excessive force was violated during both the first and second traffic stops. Defendant Mandopoulos urges this court to dispose of the instant matter through summary judgment on the grounds that his conduct toward Mr. Dye did not violate a clearly established constitutional right and, therefore, is shielded by qualified immunity.

■ As the Supreme Court directed in *Harlow*, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is not a defense to liability; where it is applicable, its purpose is to shield the officer from suit altogether, saving him or her from the burdens of discovery and costs of trial. *See Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Skousen v. Brighton High School*, 305 F.3d 520, 526 (6th Cir.2002).

■ Considering a question of qualified immunity pursuant to a Section 1983 claim requires a two-step process. *Brosseau v. Haugen*, —— U.S. ——, 125 S.Ct. 596, 598, 601, 160 L.Ed.2d 583 (2004) (considering only the second step of qualified immunity while expressing no view as to the correctness of the reviewing court's decision on the constitutional question; with a concurring trio of justices urging the Court to address the rigid sequence of judicial inquiry constructed in *Saucier* as making little administrative sense when considering the qualified immunity question prior to the constitutional question will resolve the case). First, this Court considers whether "[t]aken in the light most favorable to the party asserting the injury . . . . the facts alleged show the officer's conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "[I]f a violation could be made out on a favorable view of the parties' submissions, the next sequen-

tial step is to ask whether the right was clearly established." *Id.; Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151; *Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (observing "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation"). Such an assessment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865.

■ In instances of excessive force claims, this Court considers the facts and circumstances of each particular case, taking into account such nonexhaustive factors as enunciated in *Saucier,* including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Saucier,* 533 U.S. at 205, 121 S.Ct. 2151 (citation and quotation omitted).

The first part of the *Saucier* test requires the Court to determine whether Mr. Dye has properly alleged a constitutional deprivation when viewing the evidence in the light most favorable to the plaintiff. *See also Berryman v. Rieger,* 150 F.3d 561, 563 (6th Cir.1998) (concluding the defendant is entitled to qualified immunity when the evidence, viewed in the light most favorable to the plaintiff, fails to prove a *prima facie* violation of clear con-

stitutional law). In *Graham v. Connor,* 490 U.S. 386, 393–4, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the United States Supreme Court established that the right to be free from excessive force during an arrest or investigatory stop is provided by the Fourth Amendment's prohibition against unreasonable seizures. 490 U.S. at 394, 109 S.Ct. 1865. It appears clear from the facts, considered from the vantage of the nonmovant, that Mr. Dye was not seized during the initial traffic stop and has thus not alleged a constitutional deprivation under the Fourth Amendment with regard to Count I.

■ A seizure occurs when "under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away." *United States v. Alston,* 375 F.3d 408, 411 (6th Cir.2004) (*quoting United States v. Saperstein,* 723 F.2d 1221, 1225 (6th Cir.1983)). "Obviously, not all personal intercourse between policemen and citizens involves seizures of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "If there is no detention-no seizure within the meaning of the Fourth Amendment-then no constitutional rights have been infringed." *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

■ At the first traffic stop involving Chief Mandopoulos, Mr. Dye was not seized because he did not feel restrained from leaving, as the evidence readily indicates. Moreover, the reasonable inference from Mr. Dye's account of the first encounter with the Chief is that the plaintiff pulled over to the shoulder of the road to allow passage of what he thought was a police car or emergency vehicle. Conse-

quently, Mr. Dye's first meeting with the Chief was consensual and not a seizure. *See United States v. Perez–Sosa*, 164 F.3d 1082, 1084 (8th Cir.1998) (holding that where driver did not see a trooper's flashing lights or ignored them, then pulled into a gas station and began fueling, the subsequent encounter between the officer and the motorist was a consensual encounter); *U.S. v. Garrett*, 106 Fed.Appx. 423 (6th Cir.2004) (consensual encounter without seizure occurred where plaintiff did not notice officer's flashing lights until after the plaintiff had reached his destination, parked his car, and voluntarily left the car).

■■ The second traffic stop involves a closer question of whether Mr. Dye's Fourth Amendment right to be free from an unreasonable exercise of force was violated. However, upon review of the record and considering the evidence in the light most favorable to the plaintiff, this Court concludes that Mr. Dye did not suffer a constitutional deprivation during the second traffic stop.

Mr. Dye himself acceded in state court to the fact that the officers possessed probable cause for stopping him for reckless operation of a vehicle and does not now challenge that concession. Mr. Dye admits to fleeing the scene of that initial encounter after refusing to provide the Chief with identification.[8] He admits the police possessed probable cause for citing him for resisting arrest when he finally stopped his vehicle. Mr. Dye admits to screaming and running away from the car and has pled "no contest" to disorderly conduct. Given Mr. Dye's admitted erratic behavior, both behind the wheel and on the street, Chief Mandopoulos' efforts at restraint were not *per se* unreasonable.

The Chief and the other involved officers from the City of Warren who responded to Mr. Dye's admitted reckless operation of a vehicle, did not know the full extent of the threat he posed after Mr. Dye admittedly refused to produce his driver's identification upon the Chief's request and drove from the initial traffic stop only to emerge screaming from his car during the second traffic encounter. The uncontested fact is that Mr. Dye was initially stopped by Chief Mandopoulos in the vicinity of East Market and Laird Streets while Mr. Wilson witnessed the second stop at East Market and Park Streets. Accordingly, Chief Mandopoulos pursued Mr. Dye with lights and siren for nearly one mile before Mr. Dye either stopped or was stopped. The officers' efforts to detain Mr. Dye after his vehicular flight were reasonable in light of the need to secure the plaintiff, to ensure the safety of persons in the immediate vicinity, and those who may have been at risk from plaintiff's further flight. The officers sought to secure Mr. Dye's car from further use while they worked to secure an admittedly struggling Mr. Dye.

The result of that struggle, according to Mr. Dye, was "a concussion and a sprained wrist." Yet, as conclusory statements, Mr. Dye's personal medical observations cannot be considered material in light of medical evidence that he, in fact, did not suffer those injuries. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202. The evidence provided by the hospital of tests performed on Mr. Dye the evening of 11 January 2002, the day of the incident, indicated only a "right wrist contusion and abrasion," while a CT scan of Mr. Dye's cranium proved negative for a concussion. (Exhibit 1 to Defendants'

---

8. While Chief Mandopoulos was not in uniform and driving an unmarked SUV, Mr. Dye, nevertheless, admits he pulled over in response to the Chief's flashing lights, the Chief identified himself as a police officer and provided his shield for Mr. Dye's inspection.

Combined Reply Memorandum). That evidence from Forum Health Trumbull Memorial Hospital pertaining to Mr. Dye's condition remains uncontested as Mr. Dye lacks the personal competence to offer material evidence regarding whether he received a concussion and a sprained wrist as a result of the traffic stop and detention.

Mr. Dye's lack of competence to opine on whether he suffered those injuries combines with the countervailing medical record evidence to remove those alleged injuries as a factual issue. Importantly, the hospital noted only a "contusion and abrasion" of Mr. Dye's right wrist consistent with the plaintiff's admission that he struggled against the handcuffs. The record does not indicate that Mr. Dye received any bruises or abrasions on his face, neck or head, despite his claims of being "beaten and choked," struck in the head, sprayed in the eyes with mace, and having his head "pounded . . . against the hood or roof of the police cruiser."

Even assuming, *arguendo*, that the alleged facts were material to prove the Chief's conduct excessive under objective standards of reasonableness, pursuant to *Saucier*, this would not end the analysis. *Saucier v. Katz*, 533 U.S. at 202, 121 S.Ct. 2151. The court must also conduct a second, qualified immunity review, separate from the constitutional reasonableness inquiry, in which it must determine the officers' perceptions of the alleged violated right. *See id.* at 205, 121 S.Ct. 2151. In contrast to the *Graham* constitutional violation analysis, which focuses on the reasonableness of the officials' actions, the qualified immunity analysis probes whether the officers' belief in the state of the law was reasonable.

 In *Saucier*, the United States Supreme Court etched out the contours for a defense of qualified immunity in excessive force cases, observing:

The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense. . . . Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes hazy border between excessive and acceptable force . . . and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.

*Saucier*, 533 U.S. at 205–06, 121 S.Ct. 2151 (internal citations and quotations omitted). Thus, even if the officer unreasonably used force in violation of the Fourth Amendment, qualified immunity should be granted if the officer had a reasonable, albeit mistaken, belief about the legality of the officer's actions. *See id.; Anderson v. Creighton*, 483 U.S. 635, 640–41, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Thus, under the controlling analysis enunciated in *Saucier*, if Chief Mandopoulos and the unnamed officers reasonably, but mistakenly, believed that Mr. Dye's behavior created an imminent safety hazard to himself or others, the officers would be justified in using more force than might in fact have been needed. *Saucier v. Katz*, 533 U.S. at 205, 121 S.Ct. 2151. The alleged facts, taken in the light most favorable to the nonmovant, certainly indicate the officers could reasonably believe that Mr. Dye's erratic behavior created an imminent danger.

■ The Warren police were entitled to qualified immunity for arresting Mr. Dye for disorderly conduct when his admitted erratic behavior raised questions concerning whether Mr. Dye would harm himself or others. Under those circumstances, it cannot be said there was a clearly established rule that would prohibit using the force the officers exercised to secure Mr. Dye and his vehicle. The volatility of Mr. Dye's behavior was witnessed during the second traffic stop by an independent observer who substantiated Mr. Dye's seeming instability and loss of control. In addition, the contours and cause for Mr. Dye's behavior that day were admitted by Mr. Dye's counsel in state court proceedings where he acknowledged that Mr. Dye's failure to maintain his medication during the time of the incident spawned his erratic behavior and loss of self-control. Finally, as the hospital records indicate, the sole physical consequence to Mr. Dye was an abrasion and contusion of the right wrist caused by Mr. Dye's admitted struggle against the handcuffs. Consequently, the officers could have reasonably been concerned for their safety, Mr. Dye's safety, and the safety of others in the plaintiff's vicinity, forcing the officers to make a difficult, split-second decision regarding the amount of force required to detain Mr. Dye.

## E. Monell Claim Against the City of Warren for Failure to Properly Train the Police Officers Involved in the Incident.

■ Mr. Dye seeks to hold the City liable for "failing to properly train its police officers in proper conduct towards its citizens, [and] in permitting the use of excessive force." (Complaint ¶ 32). Yet, this Court finds that the plaintiff did not suffer a constitutional injury; drawing all reasonable inferences in favor of the non-moving party, and considering the totality of the circumstances, the Chief and the officers involved in stopping Mr. Dye did not engage in an unreasonable seizure in violation of Mr. Dye's Fourth Amendment rights.[9]

As the United States Supreme Court explained in *City of Canton v. Harris*, 489 U.S. at 389–90, 109 S.Ct. 1197, a municipality's failure to train is in general not enough to prove a constitutional violation.[10]

9. If this Court had found only that the Chief and his fellow officers' actions were subject to qualified immunity the City of Warren could still be subject to liability. When an officer violates a plaintiff's rights that are not "clearly established," but a city's policy was the "moving force" behind the constitutional violation, the municipality may be liable even though the individual officer is immune. *See Barber v. City of Salem, Ohio*, 953 F.2d 232, 238 ("[I]t is possible that city officials may be entitled to qualified immunity for certain actions while the municipality may nevertheless be held liable for the same actions."); *Scott v. Clay County, Tenn.*, 205 F.3d 867, 879 (6th Cir.2000) ("[I]f the legal requirements of municipal or county civil rights liability are satisfied, qualified immunity will not automatically excuse a municipality or county from constitutional liability, even where the municipal or county actors were personally absolved by qualified immunity, if those agents in fact had invaded the plaintiff's constitutional rights"). A municipality may be liable under § 1983 where the risks from its decision not to train its officers were "so obvious" as to constitute deliberate indifference to the rights of its citizens. Deliberate indifference remains distinct from mere negligence. Where a city does create reasonable policies, but negligently administers them, there is no deliberate indifference and therefore no § 1983 liability. *See Molton v. City of Cleveland*, 839 F.2d 240, 247 (6th Cir.1988).

10. Additionally, provided the opportunity to respond to the City's Motion for summary judgment, Mr. Dye failed to make any showing that the purported need for a policy or additional training was "so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that the city was "deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390, 109 S.Ct. 1197.

Instead, Section 1983 plaintiffs can use a municipality's failure to train as one way to make the required showing that a municipal policy or custom was the "moving force" behind an already established constitutional deprivation. *See id.* at 389, 109 S.Ct. 1197. Therefore, Mr. Dye's failure-to-train claim, like his basic excessive force claim against the Chief, requires a predicate showing that Chief Mandopoulos did violate Mr. Dye's Fourth Amendment right to be free from excessive force. Accordingly, this Court's finding that the Chief was not liable for any constitutional deprivation against Mr. Dye forecloses the plaintiff's Fourth Amendment claims against the City.

To assert a successful § 1983 claim against a municipality, a plaintiff must show that a governmental policy or custom caused the injury. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Where a plaintiff alleges municipal liability for failing to train its employees adequately, liability will be found "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants...." *City of Canton*, 489 U.S. at 389, 109 S.Ct. 1197.

▮ A plaintiff suing a municipality under Section 1983 for the acts of one of its employees must prove: (1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. *City of Canton*, 489 U.S. at 389, 109 S.Ct. 1197 (*quoting Monell*, 436 U.S. at 694, 98 S.Ct. 2018); *see also Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir.2005) (finding no direct or indifferent municipal liability where individual officers did not commit a constitutional violation).

▮ It is well established that a municipality cannot be held liable under Section

1983 for the acts of an employee where the municipal employee committed no constitutional violation. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). In *Heller* the United States Supreme Court held that a jury verdict acquitting a Los Angeles police officer of a charge of excessive force precluded the imposition of liability on the City of Los Angeles for adopting a policy condoning the use of excessive force. The Court reasoned that where a municipality is "sued only because [it was] thought legally responsible" for the actions of its officers, it is "inconceivable" to hold the municipality liable if its officers inflict no constitutional harm, regardless of whether the municipality's policies might have "authorized" such harm. *Heller*, 475 U.S. at 799, 106 S.Ct. 1571. *See also Frost v. Hawkins County Bd. of Educ.*, 851 F.2d 822, 827 (6th Cir.) (interpreting Heller as holding that municipality cannot be liable where finding that plaintiff suffered no constitutional deprivation), *cert. denied*, 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988); *Bowman v. Corrections Corp. of America*, 350 F.3d 537, 545 (6th Cir. 2003) (agreeing with the district court's holding that without a constitutional violation of plaintiff's Eighth Amendment right by individual defendants, defendant prison could not be held liable for its policy, even if it were to encourage deliberate indifference); *Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir.2002) (*citing Heller* in finding no municipal liability where, viewing the facts in a light most favorable to the plaintiff, the record failed to provide the requisite showing that any employee of the City inflicted a constitutional harm upon him).

▮ This Court's finding that Chief Mandopoulos did not use excessive force against Mr. Dye as a constitutional matter precludes a finding in favor of the plaintiff

on his Fourth Amendment claim against the City.

## IV. CONCLUSION

For the reasons set forth above, this Court dismisses defendants John Does 1–5 as improperly joined outside of the applicable statute of limitations period and grants the defendants' motions for summary judgment with respect to Mr. Dye's Fourth Amendment claims against Chief Mandopoulos and the City of Warren. Accordingly, all three of Mr. Dye's claims are dismissed.

IT IS SO ORDERED.

*JUDGMENT ENTRY*

This Court, having contemporaneously entered its Order Granting Defendants' Motions for Summary Judgment, hereby enters judgment in favor of defendants John Mandopoulos, John Does 1–5, and The City of Warren and against plaintiff Randy Dye.

IT IS SO ORDERED.